DOCKETED
SEP 21 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
SEP 17 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

GREG WALLER, and LORRAINE ZIMMERMANN, and CAMPUS INVESTMENTS, INC., an Ohio corporation,

Plaintiffs

v.

VILLAGE OF LAKE VILLA, ILLINOIS, a municipal corporation, and FRANK M. LOFFREDO and DAVID DYKSTRA, and BILL EFFINGER, and JOYCE FRAYER, and DAVID HARTWIG, and JAMES MCDONALD and ROBERT RAUKOHL, and and ROBERT STREICHER and JOHN MULLEN

Defendants

Case No. 03CV-7224

Judge: Hon. Rebecca R. Pallmeyer

DEMAND FOR JURY TRIAL

## SECOND AMENDED COMPLAINT

COMES NOW Greg Waller, Lorraine Zimmermann, and Campus Investments, Inc. file their second amended complaint pursuant to Fed. R. Civ. P. 15(a) and for their various claims against the defendants, state the following unto this Honorable Court:

## JURISDICTION AND VENUE

1. There are multiple bases for this court's jurisdiction. This Complaint alleges violations of the Plaintiffs' rights under the United States Constitution, giving this court original "federal question" jurisdiction pursuant to 28 U.S.C. §1331 over those claims.



34

2. This Complaint also alleges violations of the Plaintiffs' rights under the Federal Civil Rights Act, 42 U.S.C. §1983, to redress the deprivation, under color of law, of rights secured by the United States Constitution, giving this court original jurisdiction under 28 U.S.C. §1343(a)(3) and (4) over those claims.

3. This Complaint also alleges violations of the Plaintiffs' rights under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, in connection with a scheme by various defendants to conduct the affairs of the Village of Lake Villa through a pattern of racketeering activity, and to conspire to do so, giving this court jurisdiction over those claims pursuant to 18 U.S.C. § 1964(c).

4. This Complaint also alleges violations of the guarantees embodied in the Illinois Constitution Art. 1 §§ 2, 15, and the protections embodied in the Illinois Municipal Code, 65 ILCS 5/11-12-8 (Illinois Deemed Approval Statute) giving this court supplemental jurisdiction over those claims pursuant to 28 U.S.C. §1367(a) because those claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

5. Personal jurisdiction and venue of the defendants is predicated upon 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) since the defendants are residents of and transact their affairs in the Village of Lake Villa, which is located in Lake County, Illinois which is located within the geographical area of this court. See 28 U.S.C. § 93(a)(1) (Northern District of Illinois comprises Lake County).

## PLAINTIFFS AND DEFENDANTS

6. Plaintiff, Greg Waller is a Citizen of Ohio, he has his domicile in Indiana and engaged in the real estate development business with his principle office in Tippecanoe County, Indiana. Lorraine Zimmermann is a Citizen of Illinois, she has her domicile in Lake County, Illinois. Plaintiff, Campus Investments, Inc., is an Ohio corporation, and is engaged in the real estate development business with its place of business in either Mahoning County, Ohio or Tippecanoe County, Indiana (Greg Waller, Lorraine Zimmermann and Campus Investments are **collectively referred to as the "Plaintiffs"**).

7. The Village of Lake Villa, Illinois is a village in Lake County, Illinois, and a municipal corporation duly organized and existing under the Illinois Municipal Code, 65 ILCS 5/1-1-1 et. seq. (hereinafter "Lake Villa" or the "Village"). Lake Villa consists of 6.5 square miles with many lakes, 11.57% of the Village land is water. As of the 2000 U.S. Census there are 5,864 people, 2,052 households, and 1,594 families residing in the Village.

8. The chief executive officer of the Village is the mayor who is also called the village president, and is elected to a four-year term of office. Frank M. Loffredo, is now, and at all times relevant to this complaint was, the duly elected and acting mayor of Lake Villa (the "Mayor"). The Mayor takes care that the laws and ordinances are faithfully executed.

9. The Village is governed by the Board of Trustees consisting of six members, each elected to a four-year term of office, David Dykstra, Bill Effinger, Joyce Frayer, David

Hartwig, James McDonald, Robert Raukohl are now, and at all times relevant to this complaint were the duly elected and acting trustees of Lake Villa (the "Trustees").

10. The Village is governed by the Trustees and the Mayor who make up the Board of Trustees. The Board of Trustees is the duly constituted body of the Village authorized to evaluate and approve zoning amendments and subdivisions of land within Lake Villa. David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl and Frank M. Loffredo are now, and at all times relevant were, the duly elected and acting members of the Lake Villa Board of Trustees (the "Board of Trustees").

11. All officers, whether elected or appointed, shall, before entering upon the duties of their respective offices, take and subscribe the following oath or affirmation: "I do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of Illinois, and that I will faithfully discharge the duties of the office of according to the best of my ability." (Village Code § 1-6A-3).

12. The Village has over a dozen full time employees and consultants. Robert Streicher, is the Village Plat Officer and John Mullen is the Village Attorney. Hereinafter, David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl (Trustees) and Frank M. Loffredo (Mayor), Robert Streicher (Village Plat Officer), and John Mullen (Village Attorney) are **collectively referred to as "the Defendants**."

13. Besides the Board of Trustees the Village also has a Plan Commission consisting of seven members appointed by the Mayor with the advice and consent of the Board of Trustees who serve a six-year term of office. Jerry Coia, Drake Domeo, Craig Kressner, Nelson Reese, Robert Streicher, and Steve Trkla, are now, and at all times relevant to this Complaint were, the Lake Villa Plan Commission (the "Plan Commission"). The Plan

Commission gives recommendations to the Board of Trustees regarding the approval of zoning amendments and subdivisions of land within Lake Villa.

## UNLAWFUL LAND USE EXACTION IS EXTORTION

14. The allegations below fully explain the Defendant's abuse of land planning as a pretext for extortion and retaliation. The allegations entail seven separate applications over the same property over a four-year period, and a decade of racketeering in other projects. The allegations below first explain the established law of exactions; that is then followed by general allegations of the Defendants policy of extortion and retaliation; that is followed by allegations of the Plaintiffs efforts with their first application for rezoning and subdivision approval; that is followed by the application for the grading of the land; that is followed by the second application for preliminary and final subdivision approval.

15. Exactions are conditions or financial obligations imposed on developers to alleviate their impact on public services. Exactions can take several forms: (a) Impact fees levied on developers by requiring outright payment to the municipality; (b) Dedications to the municipality of right-of-way or land; (c) Construction of infrastructure and donation of the same to the municipality.

16. In 1987 the Supreme Court held in *Nollan v. California Coastal Commn*, 483 U.S. 825 (1987) that there must be an "essential nexus" between an exaction and the government purpose for which the condition is imposed, and if the problems created by the

development are not substantially related to the exaction then the exaction condition "is not a valid regulation of land use but '**an out-and-out plan of extortion.**'" *Id*, at 837.

17. In 1994 the Supreme Court in *Dolan v. City of Tigard*, 512 U.S. 374 (1994) reaffirmed that the "absence of a nexus" will convert an exaction into "**an out-and-out plan of extortion**" *id*, at 387, and then went further, holding that even if an essential nexus exists the exaction is still unconstitutional unless there exists a "rough proportionality" between the project's impact and the exaction. *Id.*, at 391. The Court also held that the burden rests on the municipality to make an "individualized determination" that the exaction "is related both in nature and extent to the impact of the proposed development." *Id.*, at 391.

18. The upshot of *Nollan* and *Dolan* is that a developer has a constitutional right to be free from extortion from municipal officials, and a municipality cannot require a developer (by demanding money, property or improvements) to solve existing concerns or problems created by other projects, or to remedy deficiencies in existing improvements resulting from a lack of adequate municipal maintenance or construction.

19. Extortion is defined in federal law, 18 U.S.C. § 1951, as the obtaining (or attempting or conspiring to obtain) the property from another, **with his consent**, induced by wrongful use of actual or threatened fear of economic harm, or **under color of official right**.

20. Extortion under color of official right can only be committed in the context of governmental activity, with the developer's consent, and without any threats. The threats or fear is not required, but implied from the public officials position of authority over the victim. All that is necessary is that the public official was not entitled to the property demanded. In a land use context, extortion under the color of official right is the obtaining (or attempting, or conspiring to obtain) impact fees, land and improvements with the

developers consent without any proportionally between the exaction and the projects impact (*Dolan*) or without an essential nexus between the exaction and its purpose (*Nolan*).

**LAKE VILLA'S UNCONSTITUTIONAL POLICY OF EXTORTION AND RETALIATION**

21. The Defendants have a long-standing policy of demanding unconstitutional exactions (impact fees, land and improvements) as a condition of approval. The Defendants give positive regulatory action if a developer remedies deficiencies in municipal improvements resulting from a lack of Village maintenance or construction; otherwise they give negative regulatory action. If the developer refuses, his project is denied.

22. The Defendants long ago realized that delay is their secret weapon which allows them to achieve the extortion as a guise of land use planning. The Defendants have enacted many unlawful practices to ensure unreasonable expense and delay. They inflict maximum expense on the developers by requiring final engineering at the preliminary phase in violation of state law. The Defendants then use a shell game of never-ending conditions to force endless plan review changes as a ruse that the conditions are unsatisfied, all in violation of the statutory deadline for processing developments. If a developer, after first going through the procedural gauntlet should seek a meritorious legal challenge, he is met once again with every possible delay to string out the litigation for years.

23. The Defendants are aware that concurrent with any delay is the payment of taxes on the land, interest on loans, salaries and other costs (legal, engineering, etc). All but a few residential developers have the financial resources to keep their land vacant and unproductive while they litigate to force a municipality to comply with constitutional

commands. Consequently, the rare developer who refuses to go along with the Defendants unlawful demands is put in the very real fear of economic harm and possible bankruptcy.

24. The Defendants long ago realized that there is no constitutional validity to their exactions, however, they also realize that every developer will fear the threat of economic harm and possible bankruptcy that come from the delay in forcing constitutional compliance. This forces developers to **agree to unconstitutional exactions** simply to **avoid economic devastation and possible bankruptcy**In the end, the Defendants get the unlawful exactions that they desire, and the developer remedies deficiencies in municipal improvements resulting from a lack of Village maintenance or construction.

25. Examples of cronyism, nepotism, selective enforcement of application and impact fee assessment, stall and delay tactics as an economic weapon against developers, and demands for unreasonable exactions or improvements are widespread. Many developers privately acknowledge that the Village's behavior is unlawful but fear the economic harm that will befall them if they come forward.

26. Eight years ago a local developer was approaching final approval of his development, however, before they could get the final approvals that they needed, Village officials asked them to make water and sewer improvements that the Village wanted outside their development. The Village even demanded direct payment in lieu of actually undertaking the work. The developer made the payment believing that payment of nearly fifty thousand

dollars would be used for the improvements. However, the improvements were never made. The Village changed course and swiftly approved the plan after the payment was made. The incident went unreported because the developer had ongoing business in the Village and feared retaliatory behavior by the Village on his other development projects.

27. The Defendants policy of demanding unconstitutional exactions as a condition of approval is extortion under the color of official right, and extortion under fear of economic harm (two alternative methods of municipal extortion).

## LAKE VILLA'S POLICY OF POLITICAL FAVORITISM

28. The Defendants also have a long-standing policy of granting special privileges to political friends and financial benefactors, and of withholding of the same privileges to those not in the good graces with the Defendants. The Defendants have even retaliated against the competition of their political friends and financial benefactors by stalling competing development projects through needless reviews, excessive time to process applications or, worse, mere silence. This has resulted in the developers eventually abandoning projects, only to have the Defendants' friends re-obtain the projects and then sail through the development process with identical plans.

29. A few years ago local developer had a piece of ground in the Village that they had been trying to develop. The Village had engaged in never ending stalling techniques and even enacted various regulations to impede this developer's project. The Village required the developer to dig a well that would service areas well outside their development, as a result

of the Village's lack of maintenance or construction. After years of delays, The developer abandoned the property, selling it to a competing builder. This new owner was a political friend and financial benefactor of the Defendants. After acquiring the property, the new owner sailed through the approval process with very similar construction plans, and was never required to dig the well, provide for park space, or pay impact fees.

30. Examples of cronyism, nepotism, and favoritism are rampant in the Village. The nexus of relationships that exists is such that business opportunities are made available to a privileged few at the exclusion of others. Their insider status allows certain groups information and access not available to the public, it allows them to manipulate and abuse the Village's authority to stifle competition, and it allows them favorable treatment in securing of permits.

31. Ted Nielsen is a local business owner who operates a motorcycle and snowmobile business. His brother is Fred Nielsen a local developer. Julie Nielsen is Fred Nielsen's daughter. Julie Nielsen was recently appointed to the Lake Villa Board of Zoning Appeals. Jeff Nielsen is Julie Nielsen's cousin and the son of Ted Nielsen. Jeff Nielsen was recently appointed to the Village Plan Commission. Defendant David Dykstra, who serves on the Board of Trustees is related to the Nielsen family by marriage. Jerry Coia, who serves on the Plan Commission, works for Ted Nielsen's Snowmobile dealership.

32. The Defendants have repeatedly shown their willingness to grant special treatment to Fred and Ted Nielsen. In one instance, the Village acquired a piece of property that used to be part of the Lehmann mansion and estate. The Village stated that they were

acquiring the land for use as a park to be enjoyed by the residents of the community. Instead of using it as a park, the Village co-developed the property into a commercial site with a group of developers headed by Ted Nielsen. Ted Nielsen intended to use the commercial site as a superstore for his motorcycle/snowmobile dealership.

33. In another occurrence of political favoritism, a group of developers headed by Fred and Ted Nielsen are in the process of working with the village on a residential and commercial real estate development that is making its way through the approval process at a very fast rate despite the fact that the size, scale and complexity are such that one would suspect that a great deal of hearings, applications and discourse would be necessary to meet the requirements of the Village's process. Nevertheless, little had been said about the development or the speed with which the proposal is making its way through the approval process. On a much smaller project, with far fewer complexities, the Plaintiffs met far more resistence. Moreover, other developers with plans similar in concept and scale to that of the Nielsen group have met resistence and been stalled or forced to abandon their projects.

34. The Defendant's favoritism is at times in direct contravention of the Village's zoning ordinance. Lake View Hills which is contiguous to the Plaintiffs' land was approved on March 10, 1999 (under the April 13, 1988 Zoning Code) and is zoned R2 which only permits 20,000 square foot lots. However Lake View Hills was approved with 10,500 sq ft lots. Similarly, Cedar Crossing which is also contiguous to the Plaintiffs' land was approved on April 27, 1999 with 8,005 square foot lots in the SR3 zone which requires a minimum lot size of 12,000 square feet.

35. The Defendants have a long-standing policy of granting special privilege given to political friends and financial benefactors, by charging different fees to them than they do to the developers not in their good graces. The Defendants have a systematic pattern of inconsistent enforcement of review fee and impact fee assessments. The Defendants discuss development matters in private with their political friends and financial benefactors, well outside public open meetings. They have also engaged in many unequal applications of their regulations and of giving special privileges to political friends and the withholding of the same privileges to those not in their good graces.

## THE PROPERTY AND SURROUNDINGS

36. Plaintiff Lorraine Zimmermann is the title owner, and Greg Waller and Campus Investments are the equitable owners, with the right of possession and use, of 10 acres of real property located at 725 Grand Ave, in Lake Villa, Lake County, Illinois. The property is legally described as the West half of the East half of the Northeast quarter of the Northeast quarter of section 4, Township 45 North, Range 10 East of the Third Principle Meridian, in Lake County, Illinois (hereinafter the "Property" or "Plaintiffs Property").

37. The Property fronts on Grand Avenue, a four-lane road and improved with one single family home. The Property is rectangular in shape with 331 feet of road frontage and 1346 feet in depth. The Property is located in the southeastern section of Lake Villa in the middle of many residential homes, condominiums and apartments.

38. Single Family Homes are contiguous to the land to the west with Lake View Hills and Lake Villa Hills, and to the east with Sheehan's Subdivision. Condominiums (town-homes) are contiguous to the Property to the south with the Courtyards at Cedar

Crossing, and apartments are located directly across the street to the North with the Waters Edge Apartments. (See Exhibit 1).

39. Immediately west of the Plaintiffs Property is **Lake View Hills**, a residential subdivision (9 lots on 3.03 ac) with a gross density of 2.97 lots/ac, average lot size of 11,246 sf, minimum lot size of 10,880 sf, average lot width of 75.63 feet, and net density of 3.78 lots/ac. Also west of the Property is **Lake Villa Hills**, a residential subdivision (49 lots on 16.40 ac) with a gross density of 2.99 lots/ac, average lot size of 11,098 sf, minimum lot size of 10,279 sf, average lot width of 75.63 ft, and net density of 3.92 lots/ac. (See Exhibit 2).

40. Immediately east of the Plaintiffs Property is **Sheehan Subdivision**, a residential subdivision (36 lots on 11.67 ac) with a minimum lot size of 10,497 sf, average lot width of 69.89 ft, gross density of 3.08 lots/ac, and average lot size of 12,023 sf. Further east is the **Sanctuary of Lake Villa**, a condo development with 164 units, a gross density of 2.95 units/acre, and net density of 12.62 units/acre. (See Exhibit 3).

41. Immediately North of the Property and directly across the street from Grand Avenue is the **Waters Edge Apartments,** consisting of 108 apartments, a gross density of 7.20 units/ac, net density of 10.8 units/ac. Also north and east of the Property is **Deep Lake Shores**, a residential subdivision consisting of 30 lots on 11.81 acres, with a gross density of 2.54 lots/ac, and a minimum lot size of 10,500 sf. (See Exhibit 4).

42. Immediately South of the Property is the **Courtyards at Cedar Crossing**, a condominium development consisting of 74 condominiums on 23.08 acres, and a gross density of 3.21 units/ac. Further south of the Property, the **Cedar Crossing** subdivision, a

residential subdivision consisting of 216 lots, an average lot size of 10,465 sf, minimum lot size of 10,465 sf, and average lot width of 75.02 ft. (See Exhibit 5).

43. The Plaintiffs Property has a small man-made pond near the front of the Property, about 300 feet from Grand Avenue. (Exhibit 6, Page 4). The pond is located in the center of the Property, and since the Property has a narrow width, it is impractical to subdivide the Property without filling the pond. The small pond is a low quality isolated wetland and not regulated by the Army Corps of Engineers. The Property is also very wooded with many mature trees (Exhibit 6, Page 5) and any development will require tree removal and grading to make the Property economically viable.

**FIRST APPLICATION TO SUBDIVIDE THE PROPERTY**

44. In early September 2001, Plaintiff Lorraine Zimmermann listed the Property for sale, and many local developers inspected the Property for development. Each developer looked at developing the land with 1/4 acre lots (10,500 sf) as strong demand exists in the Village for such lots. At least two developers who were looking to buy the land hired engineers, surveyors, and planners to prepare plans to develop the land.

45. The developers submitted sketches to the Defendants to develop the land only to find that they must keep the pond and trees undisturbed. The developers responded that they must fill the pond and remove the trees to grade the land, and that any prohibitions to the contrary are oppressive. The Defendants insisted on the oppressive prohibitions against development. Certain developers, in a concession to the Defendants, submitted alternative plans for the site that included higher density housing but preserved many of the trees and

the pond. The Village responded by stating that the site is not zoned for higher density housing and that they will not approve a zoning change to permit higher density development, in disregard of the fact that high density housing exists in close proximity to the Property. The developers indicated that they would challenge this in court. The Defendants responded that the Village will appeal any legal challenge, guaranteeing that final resolution will take years to resolve. In effect, the developers had to forgo their right to compensation for the taking of 70% of the land, as a condition of development, or suffer years of delay.

46. After two years of effort, four developers abandoned their attempts to buy the land, all due to the Villages exaction of 70% of the Property. On June 14, 2003 Lorraine Zimmermann contracted to sell the Property to Greg Waller and Campus Investments. The contract is not contingent on zoning and grants the Plaintiffs the right to use, grade, subdivide and rezone the land.

47. On June 15, 2003, following Lake Villa's procedures for rezoning and subdividing property, the Plaintiffs **submitted all necessary, plans, application fees and other documents** to subdivide the Property into a 30-lot subdivision. (Exhibit 8). The application was the culmination of extensive consultation with the Village and after many subdivision layouts were studied.

48. On June 19, 2003, the Plan Commission held a hearing with the Plaintiffs and agreed that the proposed 30-lot subdivision is compatible with surrounding densities and lot

sizes and asked the Plaintiffs to formally submit for a zoning amendment (re-zoning) asking to change the land to SR4.

49. The approved minutes of the Plan Commission hearing of June 19, 2004 state "Waller's plan depicted 30 lots approx. 78' x 135' size or approx. 10,500 sf. **This board likes this proposal**. All lots would be similar to surrounding properties. Waller stated he would try to save as many trees as possible to buffer the neighbors and keep the feel of these home sites. The property is currently Zoned R-1 and R-2. Streicher recommended Waller ask for SR4 single family detached homes in his zoning changes. This property would fit into the old R-2 - 15,000 sq. lot requirements."

50. On or about June 20, 2003, following the Lake Villa procedures for subdividing property, and the recommendations of the Plan Commission, the Plaintiffs submitted all necessary, plans, application fees and other documents to re-zone the Property to SR4 and subdivide the Property into a 30-lot subdivision named **Lake Vista.** (Exhibit 6).

51. The proposed 30-lot subdivision comprises a multi-million dollar investment by the Plaintiffs, with a full construction build-out of $9 Million. The proposed 30-lot subdivision has no adverse impact on nearby residences, and will instead increase the property values of nearby residences, a majority of which are more than twenty years old.

52. The proposed 30-lot subdivision contained a gross density of 3.02 lots per acre, net density of 3.69 lots per acre, average lot size of 11,351 sf, minimum lot size of 10,880 sf, and average lot width of 79.07 feet. All utilities are available to furnish essential services for the proposed 30-lot subdivision, and the existing roads are adequate to handle the traffic from the proposed 30-lot subdivision. The proposed Lake Vista subdivision was compatible

with the surrounding densities, lot areas and lot widths. Three adjacent subdivisions (Sheehan's Subdivision, Lake Villa Hills, and Lake View Hills) all are developed with 10,500 sq. ft. lots and with gross densities around 3.0 lots per acre.

53. The **minimum lot size** proposed for the Plaintiffs Property is 10,880 sf which is larger than the minimum lot sizes of Lake Villa Hills (10,279 sf), Lake View Hills (10,500 sf), Sheehan Subdivision (10,497 sf), Cedar Crossing (8,005 sf), and Deep Lake Shores (10,500 sf). The **average lot size** proposed for the Plaintiffs Property is 11,351 sf which is similar to the average lot sizes of Lake Villa Hills (11,098 sf), Lake View Hills (11,246 sf), Sheehan Subdivision (12,023 sf), Cedar Crossing (10,465 sf), Deep Lake Shores (13,031 sf).

54. The **gross density** proposed for the Plaintiffs Property is 3.02 lots per acre which is similar to the gross density of Lake View a , 80% in Lake Villa Hills, 50% in Deep Lake Shores, and 31% of the lots in Sheehan Subdivision are smaller than the **average lot size** proposed for the Plaintiffs Property; 83% of the lots in Sheehan Subdivision, 73% in Lake Villa Hills, 58% in Cedar Crossing, and 44% of the lots in Lake Villa Hills are smaller than the **lot width** proposed for Plaintiffs Property.

## DEFENDANTS RETALIATORY DENIAL

55. On August 6, 2003, the day before the Plan Commission public hearing on the Plaintiffs proposal, commission member Jerry Coia from Illinois telephoned Greg Waller in Indiana and told him that "...while everything was great at the prior meeting, you don't know how things work around here, you are going to get ambushed and you will be denied." The only way that Jerry Coia could have known about the upcoming denial would have been if

he overheard Village officials state that they were going to deny the project. Jerry Coia works for Ted Nielsen. Fred Nielsen's daughter Julie Nielsen, was recently appointed to the Board of Zoning Appeals. Trustee David Dykstra is related to Fred Nielsen. Jeff Nielsen, was recently appointed to the Plan Commission, and is Ted Nielsen's son.

56. On August 7, 2003, the Plan Commission held a public hearing on the Plaintiffs proposal to rezone to SR4 and to subdivide the land into 30-lots. The Plan Commission voted to recommend denial of the Plaintiffs request to re-zone the land to SR4 but did not act on the application to subdivide the land into 30 lots.

57. The letter sent to the Board of Trustees from the Plan Commission is dated August 7, 2003, and states in typed format "we hereby recommend approval as presented." The word approved is then scratched out and the word "disapprove" is handwritten in. The letter is a further indication that approval was initially intended but somehow ambushed. Clearly something sinister happened for the Plan Commission to change from their conclusion from the first meeting that "**this board likes this proposal**" to a denial.

58. On August 27, 2003, the Lake Villa Board of Trustees considered the zoning of the Plaintiffs Property and voted to deny the Plaintiffs request to re-zone the land to SR4, but did not act on the application to subdivide the land into 30 lots.

59. The Property has a small man-made pond near the front of the Property, about 300 feet from Grand Avenue. (See Exhibit 6). The pond is located in the center of the Property, and since the Property has a narrow width, it is impractical to subdivide the Property without filling the pond. The pond is a low quality isolated wetland and not within

the jurisdiction of the Army Corps of Engineers. The Defendants confirmed at the August hearings, and in subsequent discussions, that they will not allow the Plaintiffs to fill the man-made pond and that two acres of the Property (20%) must remain in permanent open space.

60. The Property is very wooded with many mature trees (Ex. 6, Pg 5), and while many nearby subdivisions, which are similarly situated, were cleared of their trees before development, the Defendants confirmed at the August hearings and in subsequent discussions, that they will not allow the Plaintiffs to remove many of the trees, forcing five acres of the Property (50%) to remain in permanent open space.

61. The Defendants have effectively mandated that 70% of land remain in its natural state, thereby, destroying all economical value of the Property, making residential development of the Property financially unfeasible, and limiting the use of the 10-acre Property to only one existing habitable structure.

62. The burden of clearing trees to grade land is not unique to the Property. The Defendants have permitted adjacent subdivisions, which are similarly situated, to develop with extensive grading, by filling existing ponds and removing all the trees. The Defendants have unfairly singled out the Plaintiffs for unequal treatment.

63. The Defendants did not make any individualized determination that requiring the wetlands or trees in open space, is related both in nature and extent to the impact of the proposed development (*Dolan* violation). Moreover, the burden of wetlands and trees preservation is not roughly proportional, nor directly proportional, to the proposed project's impact on the Village. (Illinois increases the federal burden of rough proportionality to a

direct proportionality. Burden must be "specifically and uniquely attributable" to the projects impact. *Pioneer Trust & Savings Bank v. Mount Prospect*, 176 N.E.2d 799, 802 (Ill. 1961)).

64. The many statements made at the August 7 and August 27, 2003 hearings by the Defendants, and the discussions since that hearing, made it clear to the Plaintiffs that no development of the Property will be approved, and on October 14, 2003, the Plaintiffs filed their first complaint, *Waller v. Lake Villa*, in this court, seeking damages and the right to develop the land (this is the second amendment of the initial complaint).

## PLAINTIFFS APPLICATION FOR A GRADING PERMIT

65. The Defendants have a legal obligation to proceed in good faith in reviewing and processing development plans. Their duty of good faith includes discussing matters involving technical requirements or ordinance interpretations with the applicant. Nonetheless, on December 3, 2003 Greg Waller from his Indiana office telephone Building Commissioner, Robert Streicher in the Village's Illinois office, and asked what forms and procedure are necessary for a grading permit. Defendant Streicher refused to answer his question, and said "you sued us so I can't talk to you. Talk to our lawyer, John Mullen."

66. On December 9, 2003, the Defendants received six grading plans and a letter on the Plaintiffs behalf seeking to grade the Property. (Exhibit 7). The letter sought "a permit to grade the property as shown on the plan, and to take out all trees within the area noted on the plan." The letter sought clarification of "**what procedural mechanism is necessary for a grading permit**" and if "a specific application is required and more copies of the enclosed

grading plans, or perhaps a specific fee, please forward the proper application and information and this will be corrected immediately." The letter noted that this "application is separate of the prior zoning which was rejected by the Village and presently in litigation."

67. On December 18, 2003, the Plaintiffs attorney sent a letter to John Mullen, the Village attorney, which asked to let him "know if we can meet and discuss the grading request now before the Village."

68. On January 2, 2004, the Plaintiffs attorney sent another letter to John Mullen, the Village attorney, which stated that Charles Hervas (the Village's attorney in the in federal court litigation) "asked that I meet with you and the Village Planner to determine if resolution is possible. Please let me know what afternoon dates are available and Mr. Waller and I will attend. Mr. Hervas' letter indicates that a major sticking point is 'the management of natural resources.' We are open to discussing this with the Village in an effort to reach a resolution, however, we believe that the Village's resource protection, as applied to this property, is an uncompensated taking of the land. The proposed subdivision seeks to use the natural resources in the same manner as did the neighboring subdivisions. I have seen nothing to indicate a substantial interest in treating this property differently. . . .Mr. Waller is agreeable to making minor modifications to satisfy the Village Planner, however, the ability to utilize the property with any semblance of fairness and constitutionality will not allow any major modifications of the grading and tree preservation. This of course, is not an offense to Lake Villa, as this is how nearby properties have been developed."

69. On January 19, 2004 after two prior letters to the Village attorney did not produce any response to the grading application, the Plaintiffs attorney (Sebastian Rucci) wrote to John Mullen that this was his "last attempt to seek a response to my grading request before seeking Court intervention into a simple request." The letter noted that "in early December Mr. Waller contacted Lake Villa Building Commissioner, Robert Streicher and asked about what forms and procedure are necessary for a grading permit. Mr. Streicher refused to answer his question. On Dec. 9, 2003, Mr. Streicher received a request from me for approval, or clarification of what mechanism, if any, was required to grade and remove the trees on Mr. Waller's property as shown on the submitted plan. The same letter was sent to Charles Hervas, who informed me on Dec. 18, 2003, to contact you directly. I sent you a fax on Dec. 18, 2003, asking about the grading and tree removal. I also telephoned your office the next day asking to meet. As of the date of this letter you have not responded."

70. The January 19, 2004 letter to John Mullan continued: "Exclusive of the lack of cooperation with a permit, that is separate of the prior zoning/subdivision denial. On Friday, January 16, 2004, I went to Village Hall and asked to see the Village Code Book. I was given a green book which I was told is the complete up to date code book. The book however was missing many of the codes. For example, the Site Development Ordinance in Article 13 was missing. When I asked to see or buy a copy of the same ordinance. I was told that I could not see it, and could not buy a copy of the same. . . .[this] is a clear violation of the Local Records Act. See 50 ILCS § 205/3a ("records shall be available for public inspection during regular office hours.") Please consider this letter my last effort to seek

information about the grading of the property. If the Village does not respond to this request by the end of the week, I will seek an immediate relief in Federal Court."

71. On January 19, 2004, the Plaintiffs attorney (Sebastian Rucci) received a fax of a letter dated January 15, 2004 at his office in Ohio, from John Mullen from his office in Illinois (he also received the letter in the mail on January 21, 2004). The letter stated: "In order to do site grading, you must secure a site development permit. Your application has been reviewed. I have enclosed a copy of Brett Bennett's letter of 1/9/2004, which I received today. You will need to address the items he raised in order to move forward on the site development permit. The Village is **willing to sit down with you to evaluate the site and your proposed development**. In order to do this, you do need to obtain a wetland delineation report. SMC [Stormwater Management Commission] is going to require this report in any event. **Once you furnish us with this report,** the Village Planner, Building Inspector, and **I can meet with you and your client** to attempt to resolve this matter."

72. On March 11, 2004, the Plaintiffs submitted wetland reports, affidavits, revised drawings, and hydraulic calculations, as requested, to Village attorney John Mullen and Village Engineer Brett Bennett. The letter concluded to please let them "know if you need additional information to approve the grading plan."

73. The statements in John Mullen's January 19, 2004, fax that the "Village is willing to sit down with you to evaluate the site and your proposed development" and that "once you furnish us with this report, the Village Planner, Building Inspector, and I can meet

with you and your client to attempt to resolve this matter" is part of the scheme to ask for endless information to stall. The Defendants did not provide any clarification of what if any procedural mechanisms are necessary for a grading permit, nor did the Defendants request a specific application or specific fee. The Defendants lack of cooperation in seeking a grading permit, like refusing to allow the copying of its ordinances, is an obvious attempt to delay. To date the permission to grade the property has not been approved nor rejected.

74. On June 30, 2004, the Plaintiffs attorney (Sebastian Rucci) sent a letter to John Mullen which stated that "On March 11, 2004, Campus submitted wetland reports, affidavits, revised drawings, and hydraulic calculations as requested. It is now **over three months since the information was provided without any response** from the Village." This was a whopping seven months after the grading permit was first sought.

75. The demand for exhaustive engineering was imposed to subject the Plaintiffs to unreasonable expense and delay, as the Village does not have a specific grading permit procedure, and the request to grade the Property is therefore excluded from any requirements and permitted as of right and should have been approved at the **first request**.

76. In an effort to retaliate against the Plaintiffs for refusing to go along with many statutory and constitutional violations, the Defendants conspired to impede their grading application by ordering that the same be reviewed with greater scrutiny in order to slow down

the development and eventually ordering that efforts be taken to shut down the grading by refusing to process the same.

77. The Defendants refused to process the grading plans as **retribution for filing the lawsuit** in the denial of the first subdivision. The Defendants retaliate to send a signal to others that to "get along" they must "go along." The Defendants have long ago realized that stalling is the functional equivalent of winning on the merits and use stalling as a weapon. The Defendants have made delay a well-honed, tactical weapon.

78. The grading application has now been before the Defendants for a whopping **ten months**, and there is no viable administrative remedy which the Plaintiffs may pursue because the Defendants simply refuse to act on the grading application.

## SECOND APPLICATION TO SUBDIVIDE THE PROPERTY

79. On February 7, 2004, the Plaintiffs attorney (Sebastian Rucci) received in the mail a letter dated February 5, 2004 from Lake Villa stating that on January 14, 2004, the Village re-zoned the entire Village, placing the Plaintiffs Property in a UR-3 zone which permits 10,650 square foot lots (Lake Villa Zoning Code Art. 3 § 3A, pg. 3-3-1).

80. In a typical fashion the Defendants discussed the new zoning code in private with their political friends and financial benefactors. The Plaintiffs did not even know a new zoning code was being proposed, therefore had no opportunity for any input. The re-zoning of the Plaintiffs Property confirmed that the prior zoning of a minimum of 40,000 square feet was unreasonable and that the proposed zoning request for thirty 10,500 square foot lots was

reasonable. Consequently, the denial of the rezoning was in violation of the Plaintiffs due process rights guaranteed by Ill. Const. Art. 1 § 2.

81. The new zoning code retained the old zones for many parcels which were built under the prior zoning code of April 13, 1988. However, every subdivision which is zoned R2 does not comply with the R2 square footage of 20,000 sf minimum lots. Many subdivisions adjacent to the Plaintiffs Property are not conforming including Sheehan's Subdivision, Lake Villa Hills, Lake View Hills, Deep Lake Shores.

82. On March 19, 2004, following the Lake Villa procedures for subdividing property, the Plaintiffs **submitted all necessary, plans, application fees and other documents** to subdivide the Property into a 30-lot subdivision named **Lake Vista.** (Ex. 8). This application was identical to the first application, however, the Village's re-zoning of the land to allow 10,500 square foots permitted the use in this application, therefore, no rezoning was sought with this second application.

83. The same comparisons made above to the first subdivision application apply to this application; in sum, the proposed minimum lot size is larger than the one used at Lake Villa Hills, Lake View Hills, Sheehan Subdivision, Cedar Crossing and Deep Lake Shores. The proposed gross density is similar to the one used at Lake View Hills, and Lake Villa Hills, but substantially less than the gross density of Sheehan Subdivision, Waters Edge Apartments, Courtyards at Cedar Crossing, Sanctuary of Lake Villa and Deep Lake Shores. The proposed net density is similar to the net density of Sheehan Subdivision, but less than net density of Lake Villa Hills, Lake View Hills, Waters Edge Apartments, Sanctuary of

Lake Villa and Deep Lake Shores. The proposed average lot width is larger than the average lot width of Lake Villa Hills, Lake View Hills, Sheehan Subdivision and Cedar Crossing.

## SUBDIVISION IS STATUTORILY DEEMED APPROVED DUE TO THE VILLAGES INACTION (65 ILCS § 5/11-12-8)

84. Illinois Municipal Code, 65 ILCS § 5/11-12-8 provides definite deadlines for rendering a subdivision decision by allowing a 90-day cycle for preliminary plans and a 60-day cycle for final plans, with deemed approval of the application as the penalty for inaction.

85. 65 ILCS § 5/11-12-8 provides that the "plan Commission shall approve or disapprove the application for preliminary approval **within 90 days from the date of the application**" and if "such plat is disapproved, then within said 90 days the plan commission shall furnish to applicant in writing a statement setting forth the reason for disapproval and specifying with particularity the aspects in which the proposed plat fails to conform to the ordinances including official map."

86. Lake Villa Subdivision Code § 11-1-3.A.2.g. similarly provides that the "plan Commission shall approve or disapprove the application for preliminary approval **within 90 days from the date of filing** the application."

87. On March 19, 2004, the Village received the application for preliminary plat approval. The Village had until June 17, 2004 to act upon the preliminary application (90 days). The Village did not act upon the application and without any formal denial by the Village, the Lake Vista **preliminary plat was statutorily deemed approved on June 17, 2004** pursuant to 65 ILCS § 5/11-12-8.

88. 65 ILCS § 5/11-12-8 provides that the Village "authorities **shall approve** the proposed **[final] plat . . . within 60 days** from the date of filing application for final approval

of the plat" and "if the proposed plat is disapproved, the order or resolution shall state the reasons for the disapproval, **specifying with particularity** the aspects in which the proposed plat fails to conform to the official map."

89. Lake Villa Subdivision Code § 11-1-3.A.2.g.3. provides that upon submission of a final plat the "**approval will be automatic** if the final plat conforms to the approved preliminary plat. Upon determining to this satisfaction that the final plat conforms to the approved preliminary plat, the Plat Officer shall sign the plat and submit it to the Mayor and Village Clerk for signature."

90. On July 6, 2004, the Village received an application for final plat approval of the identical 30-lot subdivision submitted for preliminary application. The final plans included nine plans per set which included improvements plans and final record plat. (See Exhibit 9). The Village had until September 5, 2004 to act upon the application (60 days) but once again did not act upon the application and without any formal denial by the Village, the Lake Vista **final plat was statutorily deemed approved on September 5, 2004** pursuant to 65 ILCS § 5/11-12-8.

91. 65 ILCS § 5/11-12-8 provides if "the corporate authorities **fail to act upon the final plat** within the time prescribed the applicant may, after **giving 5 days written notice** to the corporate authorities, file a complaint for summary judgment" and "upon showing that the corporate authorities have failed to act within the time prescribed the **court shall enter an order authorizing the recorder to record the plat** as finally submitted without the approval of the corporate authorities."

92. On September 8, 2004, the Defendants received a five-day notice letter from the Plaintiffs giving them "the final five days written notice that we intend to file a complaint for summary judgment in the court and ask the court to enter an order authorizing the recorder to record the plat as finally submitted without the approval of the corporate authorities." The Village had until September 15, 2004 to act on the five-day letter. The Village once again did not act. The Plaintiffs have complied with all statutory process of getting a subdivision deemed approved due to inaction pursuant to 65 ILCS § 5/11-12-8.

**DEFENDANTS DEMAND UNLAWFUL REVIEW FEES**

93. On March 26, 2004, the Plaintiffs received in the mail in Lafayette, Indiana a letter dated March 24, 2004, from the Village Treasurer, Lori Heitman, the letter asked the Plaintiffs to send a check for $8, 259.50 to proceed with the application of the subdivision submitted on March 19, 2004. The letter stated: "There is an outstanding balance of $3,259.50 on your original submittal. In addition, a $5,000 deposit is required to cover the cost of consultant reviews on the new plan that you recently submitted. Once your deposit is received your plan will be submitted to the consultants for review."

94. The only fee provision found in the Lake Villa Subdivision Code is § 11-1-3.B which is titled "Fees" and provides that at "the time the preliminary plat is submitted, the subdivider shall pay a checking and processing fee payable to the Village in accordance with the following schedule: . . . Over 5 acres, but not exceeding 10 acres . . . $400.00 . . . ."

95. The Plaintiffs complied with Subdivision Code § 11-1-3.B and paid the $400.00 application fee at the time of their application. The Village accepted their check and

cashed the same on March 23, 2004, the day before the Village Treasurer wrote the letter seeking more money. (See Exhibit 8, Page 9).

96. During the first application on June 15, 2003 the Plaintiffs paid the Village $1,876.50, even though the application fee is only $500.00 pursuant to Lake Villa Zoning Code § 8.6 adopted on April 13, 1988. The Plaintiffs $1,876.50 fee paid Village Attorney, John Mullen's review fee of $437.50 dated June 24, 2003 and the one for $262.50 dated July 8, 2003. This also paid for Applied Technologies review fee of $644.00 dated August 7, 2003. This also paid for Lane Kendig's review fee of $532.50 for August 4, 2003. All fees requested after those payments are suspect as there was no further review after August 7, 2004 as the Plaintiffs application was rejected.

## VILLAGE ATTORNEY'S EXTORTIONISTIC REVIEW FEES

97. The March 24, 2004 letter claims that the $3,259.50 outstanding includes a demand from John Muller for reimbursement of $875.00 for legal work done on August 28, 2003. The $875.00 invoice seeks reimbursement for three hours to "attend plan commission/public hearing" on August 7, 2003. However, the Plan Commission minutes confirm that the public hearing started at 7:44 p.m. and at 8:35 p.m. the hearing closed. Considering that another hearing was held during the 51 minutes besides the Plaintiffs application, it is apparent that the reimbursement is inaccurate.

98. The August 7, 2003 Plan Commission adjourned at 9:57 p.m., however, they discussed four issues (a) Neumann Homes request for Concept Plan approval, (b) variation request for Southwind Drive, (c) zoning text amendments and (d) the Plaintiffs application. The Village Attorney's attendance is required by the Village and not because of the Plaintiffs development. This not an accurate reimbursement.

99. The March 24, 2004 letter claims that the $3,259.50 outstanding includes a demand from John Muller for reimbursement of $157.50 for legal work done on October 7, 2003. The records show that reimbursement is for 0.90 hours in reviewing zoning matters on October 7, 2003, a whole two months after the Plan Commission denial (August 7, 2003) and five weeks after the Trustees denial (August 27, 2003). This not an accurate reimbursement.

100. The prior invoices from the Village include a reimbursement from John Mullen of $14.42 for "FedEx to Boyer For Insurance Claim" on October 27, 2003 (the lawsuit was filed on October 14, 2003). This seeks reimbursement for seeking insurance coverage from Martin Boyer Company, the Village's insurance carrier. Clearly, not the Plaintiffs expense.

**VILLAGE PLANNER AND ENGINEERS**
**EXTORTIONISTIC REVIEW FEES**

101. The March 24, 2004 letter claims that the $3,259.50 outstanding includes a demand from Applied Technologies for reimbursement of $322.00 for engineering work done on October 16, 2003, nine weeks after the Plan Commission denial (August 7, 2003) and six weeks after the Trustees denial (August 27, 2003). This not a proper reimbursement, all engineering reviews had ceased after the Plaintiffs request was denied.

102. The March 24, 2004 letter claims that the $3,259.50 outstanding includes a demand from Lane Kendig for reimbursement of a whopping $1,905.00 for reviewing the Plaintiffs application on September 3, 2003. This is one month after the Plan Commission hearing (August 7, 2003) and clearly not a proper reimbursement. This reimbursement forces the Plaintiffs to pay for their opposition, since the position taken by Lane Kendig at the Aug.

7, 2004 hearing is at odds with the subsequent rezoning of the Village on Jan. 14, 2004. It is truly difficult to understand how the rezoning of the Plaintiffs Parcel was improper on August 27, 2003, but proper four months later on January 14, 2004.

103. The invoices from Village also indicated a request for reimbursement to Lane Kendig of $615.00 for work done in Feburary 2, 2004, a whopping seven months after the Plaintiffs rezoning and subdivision application was denied. The lawsuit was filed on October 14, 2003, and this is clearly work done on the litigation, and not a proper reimbursement.

**DEFENDANTS CONTINUE TO DEMAND EXTORTIONISTIC REVIEW FEES**

104. On June 25, 2004 Greg Waller contacted the Village and asked what fee and application is necessary for final plat application. Village Secretary, Nan Thorson, informed him that there is no application fee for final plat approval. At the request of Greg Waller, on June 25, 2004 Nan Thorson, faxed the Village's final plat review procedures to Greg Waller in his Indiana office.

105. On July 3, 2004, the Plaintiffs submitted their application for final plat approval. They once again include the $400.00 review fee with their application pursuant to Lake Villa Subdivision Code is § 11-1-3.B, the Village accepted the fee, but did not cash it, nor did they return the check, which remains in their possession uncashed to this day.

106. On July 6, 2004, the Village received the application for final plat approval. One week later, on July 12, 2004, attorney John Mullen sent a fax from his Illinois office to

the Plaintiffs attorney, Sebastian Rucci in his Ohio office (the same letter was received by mail two days later) the letter stated that the Plaintiffs were sent a letter on March 26, 2004 requesting the escrow fund payment of $8, 259.50 and that the "the Village will be unable to consider your application for final plat approval unless and until the preliminary plat is reviewed and approved. This process cannot begin until the escrow funds are deposited."

107. On July 21, 2004, the Plaintiffs attorney Sebastian Rucci in his Ohio office telephone the Village attorney John Mullen at his Illinois office and asked for a copy of the Village regulation which require the escrow fund payment sought in the July 12, 2004 letter.

108. On July 26, 2004, Village attorney John Mullen sent a fax from his Illinois office to the Plaintiffs attorney, Sebastian Rucci in his Ohio office (the same letter was received by mail two days later) the letter stated this "memo is in response to your recent telephone inquiry. The payment of the professional fee escrow deposit is required by sections 1-8-1 through 1-8-8 of the Village Code. This payment needs to be made before the review process can begin on your submittal for preliminary plat approval."

109. The July 26, 2004 letter from John Mullen also stated: "As to a meeting to attempt to resolve this matter, I would suggest that you first obtain the required SMC review . . . . Once the review is completed, we should be in a position to meet to discuss the overall project." Six months earlier, on January 15, 2004 John Mullen stated "you do need to obtain a wetland delineation report" and once you furnish us with this report we "can meet." The requested reports were provided on March 11, 2004, yet no meeting was ever set.

**DEFENDANTS PROFESSIONAL FEE ORDINANCE IS UNLAWFUL**

110. The July 26, 2004 letter did not include a copy of Village Code §§ 1-8-1 through 1-8-8 as requested by the Plaintiffs attorney. Hence, on July 28, 2004 the Village Secretary, Nan Thorson, at the request of Greg Waller, faxed from the Villages Illinois office, to Greg Waller in his Indiana office, a copy of Village Code §§ 1-8-1 through 1-8-8.

111. A review of the July 28, 2004, fax of Village Code §§ 1-8-1 through 1-8-8 did not provide any guidance as to what authority if any existed to enact a fee regulation. Consequently, the Plaintiffs made a freedom of information request for Ord. 88-5-2, dated April 28, 1988 and on August 2, 2004 obtained Ordinance No. 88-5-2 an Ordinance Regarding the Reimbursement of Professional Fees (Village Code Title 1 Chapter 8).

112. Village Code § 1-8-4 provides that "this Chapter shall apply to all instances in which this **code requires** that an applicant or other individual **reimburse the Village** for its professional expenses incurred or to be incurred, and it shall apply to those Village Code provisions presently in effect or hereafter adopted which **require an applicant** or other individual to reimburse the Village for its professional fees incurred or to be incurred."

113. There is no provision in the Subdivision Code which requires an applicant to reimburse the Village its professional fees. The only fee provision found in the Subdivision Code is § 11-1-3.B and it only requires a checking and processing fee at the time the preliminary plat is submitted of $400.00 for land between five and ten acres.

114. Village Code § 1-8-5 provides that the "Village Clerk shall, upon receipt of a matter which may or will require professional services to be rendered to the village, **obtain**

**an estimate** of the amount **of the cost of expected services** based on the nature of the matter, its complexity, the relative need for professional advice, and the expected duration of processing of the matter. The Village Clerk shall so **notify the individual applicant in writing with this estimate** of the necessary funds to defray all professional costs the village might incur in the course of reviewing the matter submitted by the applicant or other individual." The "Village Clerk shall deposit the same in a separate escrow account."

115. The Village is clearly without power to violate its own ordinances. Nonetheless, the Village Clerk did not provide any estimate to the Plaintiffs of costs of expected services, nor did the Village Clerk notify the Plaintiffs in writing of the amount of this estimate. The Village Clerk simply sought a $5,000 deposit without any justification for the amount. The request for the $5,000.00 deposit is inconsistent not only with their own ordinances, but even with the shifting ad hoc imposition of fees.

116. The Defendants have failed to provide any justification for the legal authority for the Professional Fee Ordinance (Village Code §§ 1-8-1 through 1-8-8). Nor can they, there is no authorization in the Illinois Municipal Code, 65 ILCS § 5/1-1-1, et seq., for such reimbursement. The Village has establish a schedule of fees to defray the costs of processing subdivision applications. 65 ILCS § 5/11-12-8 only permits an escrow for the installation of improvements by allowing any person seeking subdivision approval to post a bond or security sufficient to cover the estimate of improvements and inspection fees. However no bond or security shall be required to be filed until the plat is approved.

117. The March 24, 2004, letter from the Village Treasurer provides that the escrow deposit is required for the recently submitted subdivision plans. The July 12, 2004, letter from Village Attorney John Mullen provided that the Village will not consider the final or preliminary until the escrow funds are deposited. However, the Village also had a grading application before them since December 9, 2003, and the Defendants have stalled the grading application so that they may apply the escrow money for the subdivision application, to the grading plan submittal, even thought a grading plan is not listed as one of the items requiring review in the Professional Fee Ordinance (see Village Code § 1-8-2).

118. The Professional Fee Ordinance does not provide for any dispute provision, consequently, the developer must pay for all fees demanded by the Village without any ability to object. The Professional Fee Ordinance does not limit expenses to actual and necessary expenses incurred in the performance of necessary reviews. The Professional Fee Ordinance does not require a contract with developer agreeing to the fees.

119. The Defendant billed the Plaintiffs for the Village Attorney to review the zoning, however, the Village Attorney did not make any comments as to the illegality of the zoning. However, after the Plaintiffs lawsuit was filed, the Village agreed with the illegality and on January 14, 2004 rezoned the Plaintiffs Property.

120. The Professional Fee Ordinance forces the Plaintiffs to subsidize the Village Attorney's silence, which is part of the weapon used to extort developers. Village Attorney John Mullen permits unconstitutional conduct to permeate the Village, fully aware that forcing the Plaintiffs to undo the unconstitutionality is more expensive than accepting it.

121. The Professional Fee Ordinance adds insult to injury by forcing the Plaintiffs to have to pay for the unconstitutional conduct advancement against them, by paying for John Mullen to review unconstitutional zoning without objections, and to sit at public meeting again without objection. The Plaintiffs clearly should not have to subsidize the retaliation.

122. The Defendants have a systematic pattern of inconsistent enforcement of review and impact fees. They engage in many unequal applications of their regulations and of giving special privileges to political friends and the withholding of the same privileges to those not in their good graces. The Defendants seek reimbursement for litigation expenses, general plan reviews not related to the Plaintiffs application, and the billing of costs un-associated with the Plaintiffs project.

**COUNT 1**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)**

COMES NOW the Plaintiffs and for their complaint for violation of 18 U.S.C. § 1962(c) against Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, each of them individually, jointly and severally (Lake Villa is not a defendant in Count 1), state as follows:

123. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

124. The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, provides a private civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

125. 18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

126. The definitional section of RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). Racketeering activity is defined in 18 U.S.C. § 1961(1)(A)-(B) to include extortion in violation of 18 U.S.C. § 1951, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and any act involving extortion chargeable under state law.

## THE RACKETEERING DEFENDANTS

127. 18 U.S.C. § 1962(c) makes it unlawful for "any person" to conduct or participate, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity. The definitional section of RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

128. Lake Villa is not a defendant in this cause of action, and damages are not sought from Lake Villa under this cause of action.

129. Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, and Frank Loffredo are elected Village Trustees and collectively comprise Lake Villa's governing body. They are responsible for overseeing the Villages

activities and finances and responsible for approving any Village developments. The racketeering activity has been ongoing since 1990, and once a Village Trustees term expires (if he does not run again) the newly elected Village Trustee is instructed of the racketeering activity and the activity continues with the new Trustee.

130. Defendant Robert Streicher is the Village Building Commissioner and Plat Officer. John Mullen is the Village attorney. They have been employed by the Village for over ten years and are responsible for managing the Village's day-to-day operations with regards to development applications. The report directly to the Village Trustees.

131. The acts of any Defendant or Village employee acting individually, were done with the knowledge, consent, approval and ratification of the other Defendants and are thereby attributed to the Defendants individually, jointly and severally.

132. The Defendants are separate, culpable parties who benefitted individually and collectively, either directly or indirectly, from the Village's pattern of racketeering activity, namely, extortion under the color of official right over a period of more than fifteen years.

133. Each and every act of the Defendants was motivated by evil intent, or reckless or callous indifference to the rights of the Plaintiffs. Each of the Defendants was in some manner proximately responsible for the events and happenings alleged in this complaint and for the Plaintiffs injuries and damages.

134. Each and every act of the Defendants was done for personal gain, self interest and for personal benefit. The Defendants live in the Village and enjoy on a first hand basis the many exaction improvements, they extorted from developers.

135. David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl (Trustees) and Frank M. Loffredo (Mayor), Robert Streicher (Village Plat

Officer), and John Mullen (Village Attorney) conducted and participated, directly and indirectly, in the affairs of Lake Villa through the pattern of racketeering activity, namely, extortion of developers under color of official right, over a period of more than fifteen years and are thereby considered persons (infiltrating racketeers) within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

**VILLAGE OF LAKE VILLA IS A RICO ENTERPRISE**

136. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of RICO defines "enterprise" as "any individual, partnership, corporation, or other legal entity." 18 U.S.C. 1961(4).

137. Lake Villa is engaged in many large commercial ventures, and purchases on a regular basis a substantial quantity of local equipment and supplies that are manufactured out-of-state. The Village also makes direct out-of-state purchases of supplies, materials, equipment and vehicles. Lake Villa is involved in many laudable governmental functions. However, it is also the vehicle through which the pattern of racketeering activity (extortion of developers) is committed. Lake Villa is also the direct or indirect beneficiary (unlawful fees, land and improvements) of the racketeering activity.

138. Lake Villa is an enterprise affecting interstate commerce within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68.

**DEFENDANTS COMMITTED MULTIPLE RACKETEERING ACTS OF EXTORTION UNDER COLOR OF OFFICIAL RIGHT**

139. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of RICO provides that extortion

in violation of federal law, 18 U.S.C. § 1951, is "racketeering activity" and considered a RICO violation. 18 U.S.C. § 1961(1)(B).

140. The federal crime of extortion is broadly defined by 18 U.S.C. § 1951(b)(2) to mean "the **obtaining of property from another, with his consent**, induced by wrongful use of actual or threatened force, violence, or fear, or **under color of official right**."

141. Under 18 U.S.C. § 1951(b)(2), extortion may be committed either by wrongful use of fear of economic harm, or under color of official right. The Defendants committed extortion under both, color of official right, and by wrongful use of fear of economic harm.

142. Extortion under color of official right is a RICO offence which can only be committed by municipal officials in the context of the work of a municipal agency. Extortion under color of official right is when a public official, **obtains (or attempts or conspires to obtain) property not due his office from another person with his consent**. The use of force, threats or fear is not required for extortion under color of official right, it is implied from the public officials position of authority over the victim.

143. The Defendants used fear of economic loss to obtain exactions (fees, land or improvements) to which they had no lawful claim. This was regularly engaged in by Defendants and regarded as routine. The Defendants threats of economic loss were veiled threats made by suggestion, implication and inference. The Defendants exploitation of fear of economic harm worked on the Plaintiffs anxiety, concern or worry about economic harm.

144. The Defendants long ago realized that stalling is the functional equivalent of winning on the merits, and they use stalling as a weapon to gain the unconstitutional exactions. The Defendants have made delay their well-honed tactical weapon and they are fully aware that the developer will fear the threat of economic harm that comes from the delay and agree to the unconstitutional exactions. The Defendants have used the threat of delay for so long (since 1990) that it is widely regarded as routine.

145. The Plaintiffs reasonably believed that the Defendant had the power to harm them economically and that the Defendants would exploit that power and harm the Plaintiffs. The Plaintiffs realized that any vindication of their rights meant that they would have to keep their land vacant and unproductive. This delay put them in fear of economic harm and possible bankruptcy. Considering all the circumstances a reasonable person situated as the Plaintiffs were situated, would have perceived a real fear of economic harm and possible bankruptcy, if they did not go along with the Defendants unlawful demands.

**(1) Extortion of Wetlands under Color of Official Right**

146. The Defendants have demanded that the Plaintiff keep the two acres of isolated wetland comprising 20% of the Property in permanent open space. The Defendants however have permitted their political friends and financial benefactors to fill their existing ponds and wetlands. The Defendants have unfairly singled out the Plaintiffs for unequal treatment.

147. The Defendants did not make any individualized determination that requiring the wetlands is related both in nature and extent to the impact of the proposed development.

Moreover, the burden of wetlands preservation is not roughly proportional, nor directly proportionality, to the proposed project impact, making the demand "an out-and-out plan of extortion." *Dolan*, 512 U.S. at 387; *Nollan*, 483 U.S. at 837.

148. Between August 7, 2003 and September 17, 2004 (date this amended complaint is filed) the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain two acres of isolated wetlands on the Property in permanent open space, with Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(2) Extortion of Wetlands Using Fear of Economic Loss**

149. Between August 7, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiffs consent, two acres of isolated wetland on the Plaintiffs Property in permanent open space, as a condition of approval, which was unlawful because the Defendants had no lawful right to the two acres of isolated wetlands, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(3) Extortion of the Trees in Open Space under Color of Official Right**

150. The Defendants have demanded that the Plaintiff keep five acres (50%) of the Property to remain in permanent open space to preserve the trees on the Property. The Defendants however have permitted their political friends and financial benefactors to remove all trees on their land. Unfairly singling out the Plaintiffs for unequal treatment.

151. The Defendants did not make any individualized determination that requiring five acres of the Property to remain in permanent open space to preserve the trees is related both in nature and extent to the impact of the proposed development. Moreover, the burden of tree preservation is not roughly proportional, nor directly proportionality, to the proposed project impact, making the demand "an out-and-out plan of extortion." *Dolan*, 512 U.S. at 387; *Nollan*, 483 U.S. at 837.

152. Between August 7, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain five acres of the Property in permanent open space to preserve the trees, with Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(4) Extortion of the Tress in Open Space Using Fear of Economic Loss**

153. Between August 7, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiffs consent, five acres of the Property in permanent open space to preserve the trees, as a condition of approval, which was unlawful because the Defendants had no lawful right to the five acres of permanent open space to preserve the trees, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(5) Extortion of $875.00 Legal Review Fee under Color of Official Right**

154. The Defendants demanded reimbursement of $875.00 for legal work done on August 28, 2003 by Village Attorney John Mullen. As stated above, the $875.00 reimbursement is unlawful.

155. Between August 28, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain $875.00 for legal work done on August 28, 2003 by Village Attorney John Mullen, with the Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(6) Extortion of $875.00 Legal Review Fee Using Fear of Economic Loss**

156. Between August 28, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiffs consent, $875.00 for legal work done on August 28, 2003 by Village Attorney John Mullen, as a condition of processing the Plaintiffs applications, which was unlawful because the Defendants had no lawful right to the $875.00, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(7) Extortion of $157.50 Legal Review Fee under Color of Official Right**

157. The Defendants demanded reimbursement of $157.50 for legal work done on October 7, 2003 by Village Attorney John Mullen, a whole two months after the Plan Commission denial (August 7, 2003) and five weeks after the Board of Trustees denial (August 27, 2003). As stated above, the $157.50 reimbursement is unlawful.

158. Between October 7, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain $157.50 for legal work done on October 7, 2003 by Village

Attorney John Mullen, with the Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(8) Extortion of $157.50 Legal Review Fee Using Fear of Economic Loss**

159. Between October 7, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiffs consent, $157.50 for legal work done on October 7, 2003 by Village Attorney John Mullen, as a condition of processing the Plaintiffs applications, which was unlawful because the Defendants had no lawful right to the $157.50, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(9) Extortion of $322.00 Engineering Review Fee under Color of Official Right**

160. The Defendants demanded reimbursement of $322.00 for legal work done on October 16, 2003 by Village Engineer Applied Technologies, nine weeks after the Plan Commission denial (August 7, 2003) and six weeks after the Board of Trustees denial (August 27, 2003). As stated above, the $322.00 reimbursement is unlawful.

161. Between October 16, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain $322.00 for engineering work done on October 16, 2003 by Village Engineer Applied Technologies, with the Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(10) Extortion of $322.00 Engineering Review Fee Using Fear of Economic Loss**

162. Between October 16, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiffs consent, $322.00 for engineering work done on October 16, 2003 by Village Engineer Applied Technologies, as a condition of processing the Plaintiffs applications, which was unlawful because the Defendants had no lawful right to the $322.00, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(11) Extortion of $1,905.00 Planning Review Fee under Color of Official Right**

163. The Defendants demanded reimbursement of $1905.00 for legal work done on September 3, 2003 by Village Planner Lane Kendig. As stated above, the $1,905.00 reimbursement is unlawful.

164. Between September 3, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain $1,905.00 for planning work done on September 3, 2003 by Village Planner Lane Kendig, with the Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(12) Extortion of $1,905.00 Planning Review Fee Using Fear of Economic Loss**

165. Between September 3, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiffs consent, $1,905.00 for planning work done on September 3, 2003 by Village Planner Lane Kendig, as a condition of

processing the Plaintiffs applications, which was unlawful because the Defendants had no lawful right to the $1,905.00, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(13) Extortion of $1,376.50 Review Fee under Color of Official Right**

166. During the first application on June 15, 2003 the Plaintiffs paid the Village $1,876.50, however, the application fee is only $500.00 pursuant to Zoning Code § 8.6. As stated above, the $1,376.50 payment is unlawful.

167. Between June 15, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by obtaining $1,376.50 in review fees, with the Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(14) Extortion of $1,376.50 Review Fee Using Fear of Economic Loss**

168. Between June 15, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by obtaining, with the Plaintiffs consent, $1,376.50 in review fees, as a condition of processing the application, which was unlawful because the Defendants had no lawful right to the $1,376.50, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(15) Extortion of $5,000.00 Review Fee under Color of Official Right**

169. The March 24, 2004, letter from the Village Treasurer, demanded a $5,000.00 deposit for consultant reviews. As stated above, the $5,000.00 payment is unlawful.

170. Between March 24, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain $5,000.00 in escrow for review fees, with the Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(16) Extortion of $5,000.00 Review Fee Using Fear of Economic Loss**

171. Between March 24, 2003 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiffs consent, $5,000.00 in escrow for review fees, as a condition of processing the application, which was unlawful because the Defendants had no lawful right to the $5,000.00 escrow, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**(17) Extortion of Engineering Reports Using Color of Official Right**

172. The January 15, 2004, letter from John Mullen demanded that the Plaintiffs produce a wetland delineation report and other engineering as a condition of having their grading permit processed. As stated above, the report and engineering were not required, and thus the demand unlawful. The wetland delineation report and other engineering cost the Plaintiffs $10,000.00.

173. Between January 15, 2004 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that

is, by obtaining $10,000.00 of engineering and wetland reports, with the Plaintiffs consent, under color of official right, in violation of 18 U.S.C. § 1951.

**(18) Extortion of Engineering Reports Using Fear of Economic Loss**

174. Between January 15, 2004 and September 17, 2004, the Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by obtaining, with the Plaintiffs consent, $10,000.00 of engineering and wetland reports, as a condition of processing the application, which was unlawful because the Defendants had no lawful right to the $10,000.00 of engineering and wetland reports, using fear of economic loss, in violation of 18 U.S.C. § 1951.

## DEFENDANTS COMMITTED MULTIPLE RACKETEERING ACTS OF MAIL AND WIRE FRAUD

175. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of the RICO 18 U.S.C. § 1961(1)(B) provides that mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343, is "racketeering activity" and considered a RICO violation.

176. The mail fraud statute, 18 U.S.C. § 1341, prohibits a broad range of activity by anyone who "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and "for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service."

177. The wire fraud statute, 18 U.S.C. § 1344, also prohibits a broad range of activity by anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire" in interstate commerce "any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme."

178. That Defendants used the mail to communicate with the Plaintiffs over a substantial period of time. The following **letters** were sent by the Defendants interstate from their Illinois offices to the Plaintiffs in their Ohio or Illinois office using the United States Postal Service:

(A). Letter dated January 15, 2004 from John Mullen which was sent through the U.S Mail in Illinois was received on January 21, 2004 by the Plaintiffs Attorney, Sebastian Rucci, in Ohio. (The letter unlawfully demanded wetland reports and engineering as a condition of review of the Plaintiffs grading permit);

(B). Letter dated March 24, 2004 from the Village Treasurer, sent through the U.S Mail from Illinois was received in the mail on March 26, 2004 by the Plaintiff Greg Waller in Lafayette, Indiana. (The letter demanded the payment of unlawful review fees);

(C). Letter dated July 12, 2004 from John Mullen which was sent through the U.S Mail in Illinois was received in the mail on July 14, 2004 by the Plaintiffs Attorney, Sebastian Rucci, in Ohio. (The letter demanded the payment of unlawful review fees as a condition of review of the Plaintiffs grading and subdivision permit);

(D). Letter dated July 26, 2004 from John Mullen which was sent through the U.S Mail in Illinois was received in the mail on July 26, 2004 by the Plaintiffs Attorney, Sebastian Rucci, in Ohio. (The letter unlawfully demanded the payment of review fees as a condition of review of the Plaintiffs grading and subdivision permit);

(E). Various letters sent by U.S. Mail by John Mullen, Lane Kendig or Applied Technologies between June 15 2003 and September 17, 2004 to the Village. (Letters unlawfully demanded the payment of review fees); and

(F). Various letters sent by Lake Villa from their Illinois office, between June 15 2003 and September 17, 2004, to Greg Waller in his Lafayette Indiana office (The letter unlawfully demanded the preservation of the retention pond, the trees, and the payment of review fees as a condition of review of the Plaintiffs grading and subdivision permit).

179. Each of the **interstate letters** sent by the Defendants used the United State mails in furtherance of their scheme to obtain (or attempt or conspire to obtain) land, fees or engineering unlawfully from the Plaintiffs, in violation of 18 U.S.C. § 1341 (Mail Fraud).

180. The following **telephone facsimiles** were sent by the Defendants interstate from their Illinois office:

(A). July 26, 2004 fax of a letter of the same date from John Mullen in Illinois to Plaintiffs Attorney, Sebastian Rucci, in Ohio. (The letter demanded the payment of unlawful review fees as a condition of review of the Plaintiffs grading and subdivision permit);

(B). July 12, 2004 fax of a letter of the same date from John Mullen in Illinois to Plaintiffs Attorney, Sebastian Rucci, in Ohio. (The letter demanded the payment of unlawful review fees as a condition of review of the Plaintiffs grading and subdivision permit); and

(C). January 19, 2004, fax of the January 15, 2004 letter from John Mullen in Illinois to Plaintiffs Attorney, Sebastian Rucci, in Ohio. (The letter unlawfully demand wetland reports and engineering as a condition of review of the Plaintiffs grading permit).

181. Each of the **interstate facsimiles** sent by the Defendants used interstate electronic communication in furtherance of their scheme to obtain (or attempt or conspire to obtain) land, fees or engineering unlawfully from the Plaintiffs, in violation of 18 U.S.C. § 1343 (Wire Fraud).

182. The Defendants committed many separate acts of mail and wire fraud in furtherance of the extortion scheme in violation of 18 U.S.C. §§ 1341, 1343. The mail or wire communication related to the extortion scheme, and was incident to an essential part of the scheme, and involved many misrepresentations reasonably calculated to deceive a person of ordinary prudence. Each time a letter was sent it deprived, or attempted to deprive, the Plaintiffs of property, and resulted in a distinct injury to the Plaintiffs and a concommitant benefit to the Defendants.

## DEFENDANTS PATTERN OF RACKETEERING ACTIVITY

183. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a "pattern of racketeering activity" which is defined as "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). Extortion in violation of 18 U.S.C. § 1951

extortion in violation of 18 U.S.C. § 1951, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and any act involving extortion chargeable under state law. 18 U.S.C. § 1961(1)(A)-(B) is considered "racketeering activity."

184. Between June 15, 2002 to September 17, 2004, the Defendants committed multiple acts of extortion against the Plaintiffs in violation of 18 U.S.C. § 1951, and multiple acts of mail and wire fraud against the Plaintiffs in violation of 18 U.S.C. §§ 1941, 1943. Each act of extortion, mail fraud and wire fraud constitutes separate instances **of interrelated racketeering activity**. The Defendants racketeering activity threatens to continue unabated, driven by the possibility of repeated economic gain, and the ability to invest the racketeering income back into the enterprise (the Village). The acts of extortion, mail fraud and wire fraud escalated confirming that the Defendants have no intention of stopping the racketeering activity which by it's very nature is projected into the future with a threat of repetition.

185. Besides the multiple extortionate acts against the Plaintiffs, there are hundreds of episodes of extortion against other developers and landowners by the Defendants as this is their regular way of conducting the Villages affairs. The extortion activities are widespread and span a period of fifteen years. The pattern of racketeering activities, affected not merely the Plaintiffs, but many other developers and landowners, and the Villages citizens as a whole. The very scope and persistence of the racketeering poses a special threat to social well-being of every resident of Lake Villa which are indirect victims of the racketeering activity (the extortion has raised the cost of housing in the Village). The Defendants policy

of demanding unlawful exactions is a pattern of racketeering activity, and unless restrained by this court, the practice is likely to continue unabated for years.

**THE PLAINTIFFS RACKETEERING INJURY**

186. The injury to the Plaintiffs business or property was proximately caused by the Defendants pattern of racketeering activity. Each act of extortion injured the Plaintiffs business or property and represents a discrete attempt to extort from the Plaintiffs and had little to do with the previous or subsequent act of extortion.

187. As a result of the restrictions stated above the Plaintiffs property is unusable, and not economically viable. The value of the Property if developed into a 30-lot subdivision would be substantially greater than if it remained in its present condition. As a result of the Defendants actions stated above, the Plaintiffs Property has depreciated in value ninety-one percent (91%) from $1,100,000.00 to a mere One Million Dollars ($100,000.00).

188. The Plaintiffs were entitled to approval of the 30-lot Lake Vista subdivision, and no independent intervening factor affected their ability to sell the lots and develop the land, except the unlawful actions of the Defendants. The Plaintiffs had contracts to sell the Property and the Plaintiffs lost development business and sale which would have netted them One Million Dollars ($1,000,000.00). The Defendants were the proximate cause of the lost profits from unconsummated sales opportunities, and the lost business of One Million Dollars ($1,000,000.00) all of which was clearly foreseeable.

189. The Defendants deprived the Plaintiffs of the right to engage in the development business in the Village free of threats of extortion, and fear of economic harm,

and as a direct and proximate result of the Defendants pattern of racketeering activity the Plaintiffs suffered great emotional trauma, discomfort and embarrassment.

190. As a direct and proximate cause of the Defendants actions of extortion and their violations of 18 U.S.C. § 1962(c) the Plaintiffs have been and continue to be injured in their business or property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

WHEREFORE, the Plaintiffs pray for judgement against Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, individually, jointly and severally as follows: For damages against David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, each of them individually, jointly and severally (Lake Villa is not a defendant in Count 1), in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c); and for costs of suit including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c) and for such other and further relief this court may deem just and proper.

## COUNT 2
## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

COMES NOW the Plaintiffs and for their complaint for violation of 18 U.S.C. § 1962(d) against Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig,

James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, jointly and severally (Lake Villa is not a defendant in Count 2), state the following:

191. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

192. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962(c)]." Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

193. The Defendant conspired and agreed with each other to engage in the conduct or attempt conducted stated above, and also conspired and agreed to aid each other in the commission of the acts of extortion, or of an attempt to commit extortion, as stated above.

194. The Defendants conspired, planned and schemed to use the Village as a racketeering enterprise to extort money, real property and personal property through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

195. The Defendants agreed to conduct or participate in the affairs of Lake Villa and agreed to commit acts of extortion, as their regular way of conducting the Villages affairs, by demanding unlawful exactions (impact fees, land and improvements) as a condition of development approval, under color of official right.

196. The Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting the affairs of Lake Villa through a pattern of racketeering activity, by committing multiple acts of extortion and retaliation on the Plaintiffs.

197. Each of the Defendants combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c).

WHEREFORE, the Plaintiffs pray for judgement against Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, individually, jointly and severally as follows: For damages against David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, each of them individually, jointly and severally (Lake Villa is not a defendant in Count 2), in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c); and for costs of suit including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c) and for such other and further relief this court may deem just and proper.

**COUNT 3**
**VIOLATION OF THE FIRST AMENDMENT**

COMES NOW the Plaintiffs and for their complaint for violation of the First Amendment to the United States Constitution against Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, jointly and severally, state as follows:

198. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

199. The conduct of David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen, was performed under color or laws, ordinances, regulations, and statutes of the Village or State of Illinois, and all such conduct constitutes "acts of the state" within the meaning of the Fourteenth Amendment and the Federal Civil Rights Act, 42 U.S.C. §1983.

200. Lake Villa acts only through its elected officials (David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo) or its employees (Robert Streicher and John Mullen) and all of the acts of Lake Villa alleged herein were done by the individual Defendants. Hereinafter David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen and Lake Villa **are collectively referred to as "the Defendants** ." (The previous referral to the Defendants did not include Lake Villa).

201. The Plaintiff's have exhausted all administrative remedies available to compel the Defendants to have their property graded and subdivided.

202. After the Plaintiffs refused to zone and subdivide their Property, the Plaintiffs filed suit. After the lawsuit was filed, the Defendants did not even process the Plaintiffs grading application, preliminary subdivision application and final subdivision application, in part, as a retaliatory strike against the Plaintiffs for suing the Village over the denial of the first application. The Defendants have simply refuse to act on the Plaintiffs grading application, preliminary subdivision application and final subdivision application.

203. The June 30, 2004, letter for final subdivision application sent to the Defendants on behalf of the Plaintiffs stated "not only has the Village delayed the

subdivision process, the village has also refused to process the submitted grading applications. . . . the present **stalling is in bad faith because the Village is being sued.** It appears that the Village is **not processing the grading and subdivision plans in retaliation** for exercising the First Amendment right to petition the courts."

204. The Defendants retaliated against the Plaintiffs because the Plaintiffs demanded constitutional and statutory compliance, in violation of the Plaintiffs rights under the First Amendment to the U.S. Constitution prohibiting retaliation for seeking redress of grievances, and prohibiting retaliation for seeking compliance with the constitution, and prohibiting retaliation for seeking to be free from extortion. The Plaintiffs have a lawful right to demand compliance with constitutional and statutory authority, and that right is protected by the First Amendment to the U.S. Constitution and actionable under 42 U.S.C. § 1983.

205. The Defendants seek to **chill the assertion of constitutional and statutory rights**, by forcing developers to give up their rights or face retaliatory denial of their project in violation of the First Amendment to the U.S. Constitution.

206. By retaliating, the Defendant seeks to chill the assertion of constitutional and statutory rights. The Defendants retaliatory acts would chill a person of ordinary firmness from filing the lawsuit and from complaining about the violations to their constitutionally protected activity in violation of the **constitutional rights of others** provided by the First Amendment to the U.S. Constitution and are actionable under 42 U.S.C. § 1983.

207. The Defendants acted with deliberate indifference to the Plaintiffs constitutional rights by caused multiple incidents of constitutional violations pursuant to

official policy and custom as a result of the Village's failure to properly train or supervise its employees and elected officials.

208. As a direct and proximate result of the actions of the Defendants the Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00).

209. The actions of David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher and John Mullen as before mentioned were done willfully, wantonly, and maliciously, with the intent of doing pecuniary harm to the Plaintiffs and done for personal gain, personal benefit and self interest, and by reason thereof, they should be required to pay to the Plaintiffs **punitive and exemplary damages**, in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00), to deter these individuals and others similarly situated from engaging in the same or like conduct (punitive damages are not sought against Lake Villa).

WHEREFORE, the Plaintiffs pray for judgment against David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher, John Mullen, and Lake Villa, jointly and severally, as follows:

(A). For damages against David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher, John Mullen,

and Lake Villa, jointly and severally, in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00); and

(B). For punitive and exemplary damages against David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher, and John Mullen jointly and severally (punitive damages are not sought against Lake Villa) in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00); and

(C). For costs of suit including reasonable attorneys fees in accordance with 42 U.S.C. § 1988, and for such other and further relief this court may deem just and proper.

## COUNT 4
## VIOLATION OF EQUAL PROTECTION

COMES NOW the Plaintiffs and for their complaint for violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution against Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher, John Mullen, and Lake Villa, jointly and severally, state as follows:

210. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

211. During the same time that the Defendants refused to act on the Plaintiffs grading application, preliminary subdivision application and final subdivision application, the Defendants approved other projects that agreed to their extortionistic demands. The other

similarly-situated developers were granted approval during the same time that the Plaintiffs were denied. The reasons for denial of the Plaintiffs request was an illegitimate desire to punish the Plaintiffs for refusing to go along with the many statutory and constitutional violations, and for filing a lawsuit against the Village.

212. The Defendants have illegitimate personal animus towards the Plaintiffs. The Defendants refuse to act on the Plaintiffs grading application, preliminary subdivision application and final subdivision application in part, because they did not like the Plaintiffs whom they feel are out-of-state trouble makers who simply will not go along with the conditions like others, and the Plaintiffs were therefore singled out for harsh treatment.

213. The actions of the Defendants alleged above violate the Plaintiff's rights to equal protection are provided by the Fourteenth Amendment to the United States Constitution, and any violation of the same is compensable under 42 U.S.C. § 1983 permitting damages for violation of the right of equal protection.

WHEREFORE, the Plaintiffs pray for judgment against David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher, John Mullen, and Lake Villa, jointly and severally as follows:

(A). For damages against David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher, John Mullen,

and Lake Villa, jointly and severally, in an amount to be determined upon trial of this action, which amount which exceeds One Million Dollars ($1,000,000.00); and

(B). For punitive and exemplary damages against Defendants David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, Robert Raukohl, Frank Loffredo, Robert Streicher, John Mullen jointly and severally, (punitive damages are not sought against Lake Villa) in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00); and

(C). For costs of suit including reasonable attorneys fees in accordance with 42 U.S.C. § 1988; and for such other and further relief this court may deem just and proper.

**COUNT 5**
**ILLINOIS REGULATORY TAKING (Ill Const. Art. I § 15)**

COMES NOW the Plaintiffs and for their complaint for violation of Article One, Section Fifteen of the Illinois Constitution, prohibiting the taking of private Property without just compensation, against defendant Lake Villa, state as follows:

214. The previous paragraphs of this Petition are incorporated into this cause of action by this reference as though fully set forth herein.

215. Article I, § 15 of the Illinois Constitution provides that "private property shall not be taken or damaged for public use without just compensation."

216. Article I, § 15 of the Illinois Constitution is designed to bar Lake Villa from forcing some people alone to bear public burdens which, in all fairness and justice, the public should bear, and to ensure that the Plaintiffs should not have to bear alone the economic burdens that rightly belong on the society that benefits from their imposition.

217. Forcing the Plaintiffs to retain 70% of the land in permanent open space has substantially interfered with Plaintiffs enjoyment of the land, and destroyed the value of the land, and deprived the Plaintiffs of economically viable use of the land in violation of Article I, § 15 of the Illinois Constitution.

218. As a result of Lake Villa's regulatory taking of the Property, a right has accrued to the Plaintiffs just compensation from Lake Villa, however, Lake Villa has not instituted condemnation proceedings to acquire the Property, nor has Lake Villa paid, or offered to pay, the Plaintiffs any just compensation.

219. As a direct and proximate result of Lake Villa's uncompensated taking of the Property, the Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00).

WHEREFORE, the Plaintiffs pray for judgment against Lake Villa, as follows: For damages against Lake Villa in an amount to be determined upon trial of this action, which amount which exceeds One Million Dollars ($1,000,000.00); and for costs of suit including reasonable attorneys fees, and for such other relief this court may deem just and proper.

## COUNT 6
## VIOLATION OF ILLINOIS MUNICIPAL CODE (65 ILCS § 5/11-12-8)

COMES NOW the Plaintiffs and for their complaint for violation of the Illinois Municipal Planning Code, 65 ILCS § 5/11-12-8, against Lake Villa, state as follows:

220. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

221. Illinois Municipal Code, 65 ILCS § 5/11-12-8 (Illinois Deemed Approval Statute) establishes definite deadlines for obtaining approval of a subdivision by allowing a limited cycle for each mandatory step in the procedure, with deemed approval of the subdivision as a penalty for inaction. The Defendants have not approved a single development within the statutory deadline during the past ten years.

222. The Plaintiffs complied with all procedures for preliminary and final plat approval and their subdivision is now deemed approved on September 5, 2004 pursuant to 65 ILCS § 5/11-12-8.

223. An actual controversy has arisen and now exists between the Plaintiff's and Lake Villa relating to their respective rights and duties. The Plaintiffs contends their subdivision is deemed approved pursuant to 65 ILCS § 5/11-12-8. The Plaintiffs desire a judicial determination of their rights and duties. A judicial determination is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

WHEREFORE, the Plaintiffs, pray for this Court to enter its declaratory judgment, adjudging, declaring and decreeing judgment against Lake Villa, as follows:

(A). For judgment enjoining and restraining Lake Villa, its officers, agents and employees from interfering with the rights of the Plaintiffs, or anyone claiming by through or under the Plaintiffs, to develop the Property into a 30-lot residential subdivision in substantial conformance with the proposed 30-lot plan for Lake Vista (Exhibit 9);

(B). That this Court reserve and retain jurisdiction to prevent Lake Villa, its officers, agents and employees from interfering with the rights of the Plaintiffs, or anyone claiming by through or under the Plaintiffs, to construct improvements in substantial conformance with the proposed 30-lot plan for Lake Vista; and

(C). For costs of this proceeding, and for such other and further relief this court may deem just and proper.

**COUNT 7**
**VIOLATION OF ILLINOIS DUE PROCESS CLAUSE (Ill. Const. Art. I § 2)**

COMES NOW the Plaintiffs and for their complaint for violation of the Illinois due process clause, Illinois Constitution Article 1 § 2, against Lake Villa, state as follows:

224. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

225. The actions of the Defendants as stated above violates the violates the Plaintiffs rights to due process as guaranteed by Art. 1 § 2 of the Illinois Constitution guaranteeing that "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

WHEREFORE, the Plaintiffs pray for judgment against Lake Villa, as follows:

(A). For judgment enjoining and restraining Lake Villa, its officers, agents and employees from interfering with the rights of the Plaintiffs, or anyone claiming by through or under the Plaintiffs, to grade the in substantial conformance with the grading plan (Ex. 7);

(B). For judgment enjoining and restraining Lake Villa, its officers, agents and employees from interfering with the rights of the Plaintiffs, or anyone claiming by through

or under the Plaintiffs, to develop the Property into a 30-lot residential subdivision in substantial conformance with the proposed 30-lot plan for Lake Vista (Exhibit 9);

(C). That this Court reserve and retain jurisdiction to prevent Lake Villa, its officers, agents and employees from interfering with the rights of the Plaintiffs, or anyone claiming by through or under the Plaintiffs, to construct improvements in substantial conformance with the proposed 30-lot plan for Lake Vista (Ex. 3, Page 4); and

(D). For costs of suit including reasonable attorneys fees, and for such other and further relief this court may deem just and proper.

**COUNT 8**
**ILLINOIS EQUAL PROTECTION VIOLATION (Ill. Const. Art. I § 2)**

COMES NOW the Plaintiffs and for their complaint for violation of the Illinois equal protection clause, Illinois Constitution Article 1 § 2, state as follows:

226. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

227. The actions of the Defendants as stated above violates the violates the Plaintiffs rights to equal protection as guaranteed by Art. 1 § 2 of the Illinois Constitution guaranteeing that "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

WHEREFORE, the Plaintiffs pray for judgment against Lake Villa, as follows:

(A). For judgment enjoining and restraining Lake Villa, its officers, agents and employees from interfering with the rights of the Plaintiffs, or anyone claiming by through

or under the Plaintiffs, to develop the Property into a 30-lot residential subdivision in substantial conformance with the proposed 30-lot plan for Lake Vista (Exhibit 9);

(B). That this Court reserve and retain jurisdiction to prevent Lake Villa, its officers, agents and employees from interfering with the rights of the Plaintiffs, or anyone claiming by through or under the Plaintiffs, to construct improvements in substantial conformance with the proposed 30-lot plan for Lake Vista (Ex. 3, Page 4); and

(C). For damages against Lake Villa, in an amount to be determined upon trial of this action, which amount exceeds One Million Dollars ($1,000,000.00); and

(D). For costs of suit including reasonable attorneys fees, and for such other and further relief this court may deem just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Sebastian Rucci (ND IL No. 90785689)
3058 Chardonnay Lane
Poland, Ohio 44514
Phone: (330) 707-1182
Fax: (330) 707-1882
Email: Srucci1@aol.com
Attorney for the Plaintiffs

## CERTIFICATE OF SERVICE

Counsel for the Plaintiff's certifies that on September 17, 2004he deposited a copy of the above First Amended Complaint with UPS in Boardman, Ohio, in a sealed envelope with postage fully prepaid, addressed to Hervas, Sotos, Condon & Bersani, Attn: Charles Hervas, 333 Pierce Road, Suite 195, Itasca, IL 60143.